UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

CASE NO. 5:20-CV-00692

ALDO DE LEON RESENDIZ,
individually and on behalf of all others
similarly situated,

        Plaintiff,

v.

EXXON MOBIL CORPORATION,

        Defendant.

**<u>EXXON MOBIL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

February 22, 2021

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ i

INTRODUCTION ............................................................................... 1

FACTUAL ALLEGATIONS .................................................................... 3

    A.  De Leon's Application and Immigration Status ................................. 3

    B.  ExxonMobil's Internship Offer ...................................................... 4

    C.  TWIC Card Requirement and Rescission of Offer ............................ 5

MOTION TO DISMISS STANDARD ......................................................... 7

ARGUMENT ....................................................................................... 8

    I.      ExxonMobil's policy is not facially discriminatory because it classifies individuals on the basis of immigration status, not citizenship ......................... 8

        A.  Immigration status and citizenship are different concepts. .................... 9

        B.  The *Juarez* and *Rodriguez* opinions misconstrued § 1981. ..................... 12

        C.  Conflating citizenship and immigration status leads to absurd results.  14

    II.     De Leon's interpretation of § 1981 should not be given effect because it conflicts with IRCA, a more specific statute covering the same subject ............. 16

    III.    The Court should not extend § 1981's implied cause of action to aliens, such as De Leon, not lawfully admitted to the U.S. ........................................... 20

        A.  Legislative history does not support expanding the scope of § 1981. ...... 21

        B.  Courts should not read a new implied cause of action under § 1981 ....... 23

        C.  Work authorization does not confer status to sue under § 1981 ............. 25

    IV.    ExxonMobil's policy was not the but-for cause of De Leon's offer being rescinded ........................................................................................... 27

CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ........................................................................ 13

*Anderson v. Conboy,*
    156 F.3d 167 (2d Cir. 1998) ........................................................... 22

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................. 7, 8

*Astre v. McQuaid,*
    804 F. App'x 665 (9th Cir. 2020) .................................................... 28

*Ayiloge v. City of New York,*
    No. 00 CIV. 5051(THK), 2002 WL 1424589 (S.D.N.Y. June 28, 2002) ........... 9, 15

*Batalla Vidal v. Nielson,*
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ............................................... 25

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................... 7, 8

*Bhandari v. First Nat'l Bank of Commerce,*
    808 F.2d 1082 (Jan. 29, 1987) ........................................................ 20

*Brown v. Gen Servs. Admin.,*
    425 U.S. 820 (1976) ...................................................................... 18

*Camara v. Schwan's Food Manufacturing, Inc.,*
    No. Civ. A. 04-121-JGW, 2005 WL 1950142 (E.D. Ky., Aug. 15, 2005) ......... 9, 15

*Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    913 F. Supp. 248 (S.D.N.Y. 1996) ................................................... 8, 11

*Comcast v. Nat. Assoc. of African American-Owned Media,*
    140 S. Ct. 1009, 1015 (2020) .......................................................... 20

*Comcast v. Nat. Assoc. of African American-Owned Media,*
    140 S.Ct. 1009 (2020) ............................................................... 24, 27

*Dep't. of Homeland Sec. v. Regents of the Univ. of Calif.,*
    140 S. Ct. 1891 (2020) ....................................................... 3, 4, 25, 26

*Domino v. Kentucky Fried Chicken,*
No. 19-CV-08449-HSG, 2020 WL 5847306 (N.D. Cal. Oct. 1, 2020) ................... 28

*Estrada v. Becker,*
917 F.3d 1298 (11th Cir. 2019) ............................................................ 4, 13, 23, 26

*Graham v. Richardson,*
403 U.S. 365 (1971) ................................................................................................ 21

*Howard v. Pritzker,*
775 F.3d 430 (D.D.C. 2015) .............................................................................. 18, 19

*Hunter-Rainey v. North Carolina State Univ.,*
5:17-cv-46-D, 2018 WL 1092963 (E.D.N.C. Feb. 28, 2018) .................................. 29

*Jesner v. Arab Bank, PLC,*
138 S. Ct. 1386 (2018) ............................................................................................ 24

*Johnson v. Ry. Express Agency, Inc.,*
421 U.S. 454 (1975) .......................................................................................... 20, 23

*Juarez v. Northwestern Mutual Life Ins. Co.,*
69 F. Supp. 3d 364 (S.D.N.Y. 2014) .......................................................... 12, 13, 14

*LeClerc v. Webb,*
419 F.3d 405 (5th Cir. 2005) ................................................................................. 13

*Neitzke v. Williams,*
490 U.S. 319 (1989) .................................................................................................. 7

*Ofoche v. Apogee Medical Grp., Va., P.C.,*
4:18-cv-00006, 2019 WL 254674 (W.D. Va. Jan. 17, 2019) .................................... 9

*Patterson v. McLean Credit Union,*
491 U.S. 164 (1989) .......................................................................................... 16, 17

*Rich v. Assoc. Brands, Inc.,*
559 Fed. Appx. 67 (2d Cir. Mar. 19, 2014).......................................................... 29

*Rodriguez v. The Procter and Gamble Corp.,*
465 F. Supp. 3d 1301 (S.D. Fla. 2020) ........................................................*passim*

*Sharifi Takieh v. Banner Health,*
No. 19-cv-05878-PHX-MTL, 2021 WL 268808 (D. Ariz. Jan. 29,
2021).................................................................................................. 27, 28, 30

ii

*Takahashi v. Fish & Game Comm'n.*,
    334 U.S. 410 (1948) ................................................................. 21, 22

*Talwar v. Staten Island Univ. Hosp.*,
    No. 12-CV-0033 CBA JMA, 2014 WL 5784626 (E.D.N.Y. Mar. 31,
    2014), *aff'd in part, vacated in part, remanded*, 610 F. App'x 28 (2d
    Cir. 2015) ........................................................... 9, 10, 14, 15

*Vaughn v. City of New York*,
    No. 06-CV-6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010).................. 9, 10, 15

*Wanger v. G.A. Gray Co.*,
    872 F.2d 142 (6th Cir. 1989) ................................................... 29

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ....................................................... 23, 24

**Statutes**

8 U.S.C. at §1324b(a) ............................................................ 10

8 U.S.C. §1182(a)(6) ............................................................ 25

8 U.S.C. § 1227(a) .............................................................. 25

8 U.S.C. §1324a(h)(3) ........................................................... 25

8 U.S.C. § 1324b ........................................................ 7, 11, 16

8 U.S.C. § 1324b(a)(2)(C) ....................................................... 30

8 U.S.C. § 1324b(a)(3) .......................................................... 17

8 U.S.C. §1324b(b)-(j) .......................................................... 17

8 U.S.C. §1325b(a)(3) ........................................................... 14

28 U.S.C. §2401(a) .............................................................. 19

42 U.S.C. § 1981...............................................................*passim*

Civil Rights Act of 1866 ...................................................... 18, 24

Civil Rights Act of 1870 ........................................................ 21

Immigration and Naturalization Act .............................................. 25

Immigration and Reform Control Act of 1986.....................................*passim*

iii

**Other Authorities**

8 C.F.R. 274a.2 ........................................................................... 25

8 C.F.R. § 274a.12(c)(18) (2012) ........................................... 15, 25

49 CFR § 1572.105 ................................................................... 5, 6

131 Cong. Rec. 23730 (Sept. 13, 1985) ................................ 18, 19

132 Cong. Rec. 30001 ................................................................. 19

Cong. Globe, 41st Cong., 2d Sess. 3658 (1870) .................... 22, 23

Federal Rule of Civil Procedure 12(b)(6) .................................... 7

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 209 (10th ed.
    1998) ........................................................................................ 11

Defendant, Exxon Mobil Corporation ("ExxonMobil"), files the following memorandum of law in support of its Motion to Dismiss Plaintiff's Complaint.

## INTRODUCTION

Plaintiff Aldo De Leon Resendiz ("De Leon") files a single claim Complaint under 42 U.S.C. § 1981 alleging that ExxonMobil rescinded his internship offer because of a company policy barring from employment certain noncitizens who have only short-term work authorization. He claims that ExxonMobil's policy, which allows the employment of any noncitizen with permanent authorization to enter and work in the country, is facially discriminatory on the basis of citizenship. He acknowledges, however, that independent of ExxonMobil's policy, the federal government did not grant him a credential required to work at the facility where he was offered the internship because, given his status under the Deferred Action for Childhood Arrivals ("DACA") program, he lacked the necessary citizenship or immigration status. Taking these and the other allegations in the Complaint as true, De Leon's § 1981 claim should be dismissed for four independent reasons.

First, De Leon's claim that ExxonMobil's policy is facially discriminatory contradicts the established distinction between immigration and citizenship status. As the Immigration and Reform Control Act of 1986 ("IRCA") and courts acknowledge, immigration status and citizenship are different concepts. Under § 1981, an employer cannot reject candidates because they are not U.S. citizens. Section 1981, however, does not bar employers from considering the incidences and conditions of an applicant's immigration status. Congress made this clear in IRCA when it forbid discrimination

1

based on some, but not all, immigration statuses. As evident from De Leon's allegations, ExxonMobil hires both citizens and non-citizens. Its policy, in fact, tracks exactly the immigration statuses protected by Congress from citizenship discrimination. Thus, the policy is not facially discriminatory under § 1981.

Second, De Leon's interpretation of § 1981 contradicts the definition of citizenship discrimination adopted by Congress in IRCA, which allows discrimination against noncitizens who are not admitted lawfully to the country. His interpretation violates the canon of statutory construction that courts should not interpret an earlier, broad statute in a manner that contradicts a subsequent, more specific statute on the same subject.

Third, De Leon is not a protected person under § 1981. Allowing aliens who have never been lawfully admitted to the country standing to sue under § 1981 extends the scope of the persons protected beyond Congressional intent. As President Obama's administration acknowledged when enacting the DACA program, and as courts have uniformly maintained since, DACA status does not confer lawful admission. The work authorizations provided to DACA recipients also do not confer legal status. DACA recipients were not lawfully admitted and remain subject to deportation; their status only gives them a temporary reprieve from expulsion. Allowing aliens not lawfully admitted to the country status to sue under § 1981 extends, without support, the scope of protection under the statute. Indeed, given the history and text of § 1981, such extension requires reading into the statute an implied cause of action, a reading the Supreme Court highly disfavors.

2

Fourth, De Leon cannot meet § 1981's but-for causation standard. As the Supreme Court reaffirmed last year, § 1981 plaintiffs must allege and prove that, absent the discriminatory conduct, they would not have suffered the alleged harm. De Leon, however, acknowledges that his DACA status rendered him ineligible for the government-issued credential required to work at ExxonMobil's Baton Rouge facility. As a result, De Leon was ineligible, independent of ExxonMobil's policies, for the internship to which he applied and was offered. Thus, De Leon cannot prove that ExxonMobil's policy was the but-for cause of the adverse employment action.

For these independent reasons, which ExxonMobil explains and supports below, the Complaint should be dismissed with prejudice.

## FACTUAL ALLEGATIONS[1]

### A. De Leon's Application and Immigration Status

In September of 2018 De Leon applied to ExxonMobil for a chemical engineer internship position. Complaint, at ¶¶ 5, 10. At the time, he was a student at North Carolina State University; he maintained a 4.0 GPA and was part of the prestigious Goodnight Scholars Program. *Id*. at ¶ 8. When he applied to ExxonMobil, De Leon was a DACA recipient with short-term work authorization. *Id*. at ¶ 5.

The DACA program was initiated by President Obama's administration in 2012. *Id*. The program allows applicants—those who arrived in the United States as minors but had not been lawfully admitted to the country—deferral from deportation. *Dep't. of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1901 (2020).

---

[1] The factual recitations here are taken from the Complaint, which ExxonMobil accepts as true, as it must, for purposes of a motion to dismiss.

3

Individuals admitted to the program could also receive short-term work authorization, which could be renewed every two years. *Id*. As the memorandum creating the DACA initiative emphasized, however, granting DACA status or work authorization under the program did not confer legal status to the recipient, who remained unlawfully present in the country and subject to deportation. *Estrada v. Becker*, 917 F.3d 1298, 1301 (11th Cir. 2019).

The United States Department of Homeland Security ("DHS") first approved De Leon's DACA status in 2012. Complaint, at ¶ 5. He also applied for and was granted temporary work authorization at that time. *Id*. De Leon subsequently renewed his DACA status and work authorization. *Id*.

### B. ExxonMobil's Internship Offer

In September 2018 De Leon submitted an online application to ExxonMobil for a chemical engineer internship to start in the summer of 2019. *Id*. at ¶¶ 5, 10. He stated in the application that he was a citizen of Mexico and that he did not require ExxonMobil to sponsor him for a visa now or in the future. *Id*. at ¶ 11. De Leon also inaccurately represented that he had long-term work authorization. *Id*. at ¶ 11. He later acknowledged that he never had long-term work authorization, claiming he made a mistake in the application. *Id*.

In October 2018, ExxonMobil offered De Leon the chemical engineer internship position to begin in the summer of 2019 at ExxonMobil's Baton Rouge facility. *Id*. at ¶ 15. In its offer letter, ExxonMobil informed De Leon that its offer was conditioned on De Leon's satisfactory completion of certain requirements, including demonstrating that "the work eligibility requirements in the employment application

4

include original documentation to support your status." *Id.* at ¶ 18. De Leon requested ExxonMobil change his internship start date from the summer of 2019 to the spring of 2019 at ExxonMobil's Baton Rouge facility because he had already accepted an internship with a different company for the summer of 2019. *Id.* at ¶ 16. ExxonMobil accommodated his request. *Id.* He then submitted a new application specifically for the Baton Rouge location. *Id.* at ¶ 19.

### C. TWIC Card Requirement and Rescission of Offer

DHS required that all employees at ExxonMobil's Baton Rouge facility obtain a Transportation Worker Identification Credentials ("TWIC") card. *Id.* at ¶ 23. The TWIC card is provided by DHS, which administers the application and issuance of the card. *Id.* One of the conditions for obtaining the TWIC card is that the applicant have certain citizenship or immigration status. 49 CFR § 1572.105 (listing acceptable immigration statuses). The accepted statuses included U.S. citizenship, permanent residence, or having been designated a refugee or asylee. *Id.* DACA recipients were not eligible for a TWIC card. *Id.*

Because employees at the Baton Rouge facility were required to have a TWIC card, an ExxonMobil representative emailed De Leon in early December 2018 instructing him to apply for the card. Complaint, at ¶ 23. In its email, the representative explained to De Leon that DHS "has notified ExxonMobil that [TWIC] cards are required to enter" the Baton Rouge Refinery and Chemical Plant, where he would be working. *Id.* After he began the application for a TWIC card, however, De Leon realized that his employment authorization rendered him ineligible for the card.

*Id.* at ¶ 24. He had not been granted any immigration status that would qualify him for the required TWIC card. *Id; see also* 49 CFR § 1572.105.

De Leon then reached out to ExxonMobil for assistance with his TWIC application. *Id.* at ¶¶ 24-25. A Human Resources representative instructed De Leon to change his response to the question "Do you now or will you in the future require company sponsorship for visa or employment authorization?" from "No" to "Yes." *Id.* at ¶ 25. De Leon believed the representative advised him to make this change hoping it would facilitate De Leon's acquisition of a TWIC card. *Id.* As the requirements to obtain the card published by DHS make clear, however, De Leon's DACA status made him ineligible for the card. 49 CFR § 1572.105. In fact, nowhere in the Complaint does De Leon allege that he ever received or qualified for a TWIC card.

Notably, during this entire time—when it offered him a position for an internship at the Baton Rouge facility, changed the start date of his internship to accommodate his other internship, and tried to help him obtain the TWIC card—ExxonMobil knew that De Leon was not a citizen of the United States and that he was an alien who remained a citizen of Mexico. Complaint, at ¶¶ 11, 19.

In late December 2018, ExxonMobil's Human Resources department called De Leon and informed him that ExxonMobil was rescinding its offer for the internship at the Baton Rouge facility. *Id.* at ¶ 26. Several days later, on December 31, 2018, De Leon received a letter from ExxonMobil rescinding the offer. *Id.* at ¶ 27. In the letter, ExxonMobil explained to De Leon that he did not meet its work authorization eligibility requirements, which required De Leon be either a citizen, national, lawful

permanent resident, conditional permanent resident, asylee, refugee, or temporary resident—the same categories of immigrants protected from citizenship discrimination under IRCA. *Id.*; *see* 8 U.S.C. § 1324b. This is the policy De Leon claims is facially discriminatory. Complaint, at ¶ 1.

Almost one year later, in September 2019, an ExxonMobil representative called De Leon to discuss other internship opportunities. Ultimately, however, ExxonMobil did not offer De Leon an internship. Complaint, at ¶¶ 29-30. De Leon does not allege that, aside from his September 15, 2018, application for the summer 2019 chemical engineering internship, he has ever submitted any other job applications to ExxonMobil. De Leon also does not allege that he was considered for any specific position other than the internship position at the Baton Rouge facility. That was the only employment position ExxonMobil ever offered him and thus the only offer it rescinded. *Id.*

As ExxonMobil shows below, based on these allegations—all taken from his Complaint—De Leon does not state a claim for relief under § 1981.

## <u>MOTION TO DISMISS STANDARD</u>

Dismissal is warranted under Federal Rule of Civil Procedure 12(b)(6) if, assuming the truth of the factual allegations of the plaintiff's complaint, there is a dispositive legal issue that precludes relief. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). Even if it states a cognizable legal theory, "to survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this

7

pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, 'the defendant-unlawfully-harmed-me accusation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). The Supreme Court has emphasized that "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action, on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555-56 (internal quotes omitted). De Leon's allegations do not meet that standard.

## ARGUMENT

### I. ExxonMobil's policy is not facially discriminatory because it classifies individuals on the basis of immigration status, not citizenship.

De Leon claims that ExxonMobil's policy is facially-discriminatory on the basis of alienage. Complaint, at ¶¶ 1, 54. As his allegations show, however, ExxonMobil does not classify individuals based on citizenship, but rather on immigration categories. And as various courts and Congress have made clear, citizenship and immigration categories are different concepts.

Courts have held that § 1981 forbids discrimination based on citizenship. *See e.g.*, *Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 913 F. Supp. 248, 250 (S.D.N.Y. 1996) ("[S]ection 1981 must be construed to prohibit private discrimination on the basis of citizenship."). But De Leon's allegations do not establish citizenship discrimination. Indeed, his allegations show that ExxonMobil did not reject him because he was a citizen of Mexico or even more broadly because he was not a U.S. citizen. His claim fails as an initial matter, then, because ExxonMobil's policy is not facially discriminatory on the basis of citizenship.

**A. Immigration status and citizenship are different concepts**.

Courts and Congress have made clear that citizenship and immigration status are distinct concepts. This principle was most succinctly stated in *Vaughn v. City of New York,* No. 06-CV-6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010), where the court explained "that alienage discrimination is discrimination on the basis of citizenship status, not immigrant status. Discrimination on the basis of a person's status as an immigrant to the United States is not alienage discrimination unless it is also motivated by the lack of U.S. citizenship." *Id.* at *10. *See also Camara v. Schwan's Food Manufacturing, Inc.*, No. Civ. A. 04-121-JGW, 2005 WL 1950142 (E.D. Ky., Aug. 15, 2005) (dismissing claim, noting that there was "no published case from any court to support his claim that private discrimination against a specific class of non-citizens-asylees is prohibited by § 1981."); *Ayiloge v. City of New York*, No. 00 CIV. 5051(THK), 2002 WL 1424589, at *16 (S.D.N.Y. June 28, 2002) (dismissing claim, explaining "[a]lienage discrimination involves discriminating against an individual on the basis of their foreign citizenship."). As a district court within the Fourth Circuit recently noted in dismissing a purported race discrimination claim: "this is a case of immigration [status] discrimination—a class of discrimination that is not outlawed by either Title VII or § 1981." *Ofoche v. Apogee Medical Grp., Va., P.C.*, 4:18-cv-00006, 2019 WL 254674, at *2 (W.D. Va. Jan. 17, 2019).

In *Talwar v. Staten Island Univ. Hosp.*, No. 12-CV-0033 CBA JMA, 2014 WL 5784626 (E.D.N.Y. Mar. 31, 2014), *aff'd in part, vacated in part, remanded*, 610 F. App'x 28 (2d Cir. 2015), the plaintiff's employer required her to obtain a medical license available only to citizens or lawful permanent residents. *Id.* at *7. The

9

plaintiff, who was neither, sued her employer under § 1981, claiming that the decision to require this license constituted alienage discrimination. *Id.* The court rejected this claim. Citing *Vaughn*, the court noted the distinction between unlawful discrimination based on a person's citizenship and lawful discrimination based on a lack of permanent work authorization status, concluding that because "United States citizenship is not a prerequisite to obtaining an unlimited medical license…[t]he Hospital's requirement that Dr. Talwar obtain an unlimited medical license does not raise an inference of discrimination on the basis of alienage." *Id.*

Like the defendant in *Talwar*, ExxonMobil did not reject De Leon because he lacked U.S. citizenship, and the policy he assails does not make a distinction on this basis. In fact, the policy accepts most of the broadest categories of aliens, including permanent residents, asylees, and refugees. Complaint, at ¶ 27. Rather, the rescission of his internship was based in part on his short-term work authorization, not on his lack of U.S. citizenship.[2] And as *Talwar* held, basing a decision on the incidence or condition of the plaintiff's immigration status is not citizenship discrimination in violation of § 1981. 2014 WL 5784626, at *7.

Congress has also recognized the distinction between immigration and citizenship status. The section of IRCA titled Unfair Immigration-Related Employment Practices prohibits employment discrimination in hiring and termination based on "national origin" or "citizenship status." 8 U.S.C. at §1324b(a). In defining the scope of work-authorized individuals who can sue for national origin

---

[2] As De Leon alleges, ExxonMobil also rescinded his offer because he could not obtain a TWIC card, a fact that is independently fatal to his claim. *See* Section IV below.

discrimination, Congress did not proscribe any limits. *Id.* at §1324b(a)(1)(A). Congress, however, limited the type of aliens who could sue for citizenship discrimination to "protected individuals." *Id.* at §1324b(a)(1)(B). Protected individuals include citizens, nationals, lawful permanent residents, certain lawful temporary residents, refugees, and asylees. *Id.* at §1324b(a)(3). These are the precise categories ExxonMobil permitted for employment purposes. Complaint, at ¶¶ 18, 27. Importantly, Congress did not protect from discrimination many other classes of immigrants (even classes of work-authorized immigrants) existing at the time, including aliens with F-1, J-1, or H-1B visas. *See* 8 U.S.C. § 1324b. Congress has also never chosen to include DACA recipients among categories protected from citizenship discrimination. Congress' decision to draw distinctions among the different classes of work-authorized aliens reveals that immigration status has a legal significance that is distinct from a person's general status as an alien.

Instead, § 1981 protects against discrimination based on citizenship. *Cheung,* 913 F. Supp. at 251 ("[S]ection 1981 must be construed to prohibit private discrimination on the basis of citizenship.") Citizenship is defined as "the status of being a citizen," while citizen is defined as "a member of a state" or "a native or naturalized person who owes allegiance to a government and is entitled to protection from it." *Citizenship, citizen*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 209 (10th ed. 1998).

De Leon's allegations show that ExxonMobil never discriminated against him based on his citizenship. He acknowledges that in his original application he made

clear that he was a citizen of Mexico, not of the United States. Complaint, at ¶ 11. He never changed this designation. ExxonMobil thus knew from day one that De Leon was not a U.S. citizen. Yet it did not reject him on this basis. To the contrary, *after* it learned that De Leon was a citizen of Mexico (that he was not a U.S. citizen), it interviewed him, offered him an internship for the summer of 2019, accommodated his request to change his internship to start earlier, and tried to help him obtain a TWIC card. *Id*. at ¶¶ 16, 25. It was only when ExxonMobil learned that De Leon had just a temporary work authorization that it rescinded the offer. Accordingly, De Leon's allegations show that ExxonMobil did not make any adverse decision or apply any policies based on his citizenship, but rather on the conditions and limitations of his immigration status. Such a decision or policy is not a violation of § 1981.

**B. The *Juarez* and *Rodriguez* opinions misconstrued § 1981.**

While two district courts outside of the Fourth Circuit have previously examined similar allegations—rejection of DACA applicants—and concluded that rejecting an alien with short-term work authorization could constitute alienage discrimination under § 1981,[3] these district courts elided the distinction between citizenship and immigration status, conflated principles of immigration law with principles applicable to other areas and protected classes, and enunciated principles that, if followed, would lead to absurd results.

First, the New York district court in *Juarez* explained that employers cannot

---

[3] *Rodriguez v. The Procter and Gamble Corp.,* 465 F. Supp. 3d 1301 (S.D. Fla. 2020) (denying motion for summary judgment); *Juarez v. Northwestern Mutual Life Ins. Co.*, 69 F. Supp. 3d 364 (S.D.N.Y. 2014) (denying motion to dismiss).

12

discriminate against a subset of a protected class just because they hire others within the protected class, and then concluded that an employer cannot make distinctions among subclasses of aliens. 69 F. Supp. 3d at 370-71. In doing so, the *Juarez* court ignored the significant distinctions between alienage and other protected categories. For example, Congress has never distinguished among subclasses of disabled persons, except if the disability impacts the ability to perform the essential functions of a job. Similarly, Congress and the courts have never made distinctions among races, finding a subset protected and another not. To the contrary, the Supreme Court has made clear that race is always a suspect class under Fourteenth Amendment jurisprudence, making it unlawful to designate among subclasses of races. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (holding that "all racial classifications…must be analyzed . . .under strict scrutiny.").

Federal courts and Congress, however, have often highlighted and accepted distinctions among aliens, especially distinctions based on immigration status. Appellate courts have concluded that, unlike race, alienage is not always a suspect class. *See e.g., LeClerc v. Webb*, 419 F.3d 405, 424 (5th Cir. 2005) (denying strict scrutiny analysis to equal protection claim brought by group of nonimmigrant aliens because "as with the alien class in general, the sub-class of nonimmigrant aliens is itself heterogeneous"). Similarly, the Eleventh Circuit has held that DACA recipients are not similarly situated to many other immigration categories (permanent aliens, refugees, and asylees). *Estrada*, 917 F.3d at 1311. Congress has also granted protection from citizenship discrimination to some aliens while not extending

protection to others. 8 U.S.C. §1325b(a)(3). Thus, holding that an employer can never discriminate against a subset of aliens, as the *Juarez* and *Rodriguez* courts did, is inconsistent with Congress' and other courts' recognition that distinctions among the alien class are permissible.

The *Rodriguez* and *Juarez* courts also never directly addressed the rule, enunciated in many cases, that alienage and immigration status are different concepts. Instead, they reasoned that the cases relying on these propositions could be distinguished factually. *See Juarez*, 69 F. Supp. 3d at n.11; *Rodriguez*, 465 F. Supp. 3d at n.17. But, like ExxonMobil here, the defendants in those cases did not cite those opinions because the facts were analogous. Rather, as ExxonMobil does here, they cited the cases because of the legal rule enunciated in the opinions: that citizenship and immigration status are legally distinct concepts. Nothing in the *Juarez* and *Rodriguez* opinions refute that principle, which applies here.[4]

### C. Conflating citizenship and immigration status leads to absurd results.

Finding that policies classifying based on immigration categories or denying some work-authorized aliens employment are facially discriminatory, as De Leon claims and as the *Rodriguez* and *Juarez* courts concluded, leads to absurd results. By this logic—refusing to allow distinctions based on different immigration categories— any facial classification based on immigration status is automatically discrimination against aliens, rendering all such classifications per se invalid under § 1981.

---

[4] Some of the cases are actually analogous to the allegations presented here. In *Talwar*, for example, the employer dismissed the plaintiff because, based on a government regulation, she could not obtain a required license. 2014 WL 5784626, at *7.

14

This would mean that, for example, an employer would violate § 1981 by refusing to hire an alien who is subject to an immediate deportation order, but was granted temporary work authorization pending removal. See 8 C.F.R. § 274a.12(c)(18) (2012) (allowing temporary work authorization pending deportation). An employer would likewise violate § 1981 by refusing to hire employees who need or in the future will need sponsorship to obtain work visas, despite explicit advice from the Department of Justice that declining to hire such workers is lawful. *See* Exhibit A - Katherine A. Baldwin, Deputy Special Counsel, U.S. Department of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices, Sept. 27, 2010 (attaching related technical assistance letters), available at https://www.justice.gov/crt/technical-assistance-letters. The *Rodriguez* court attempted to distinguish the latter example by explaining that "employers are not required to incur the financial expenses of visa sponsorship." *See* 465 F. Supp. 3d at n.21. But, like De Leon and the class he seeks to represent, aliens who need visa sponsorship are also a subset of aliens.

The Court should reject De Leon's invitation to ignore the long-recognized distinction between immigration status and citizenship. As *Vaughn*, *Ayiloge, Talwar*, and *Camara* make clear, alienage discrimination concerns the lack of U.S. citizenship. Here, it is clear that De Leon would have qualified for employment under ExxonMobil's policy, even if he never become a U.S. citizen, had he possessed a work authorization that was not temporary. In fact, ExxonMobil interviewed him, extended an internship offer, and accommodated his requests even when it knew he

was an alien.  It was not alienage or citizenship, then, but his status providing only temporary work authorization, that led ExxonMobil to rescind its offer.  Because immigration status or work authorization length are not protected categories under § 1981, ExxonMobil's policy is not facially discriminatory.

## II.  De Leon's interpretation of § 1981 should not be given effect because it conflicts with IRCA, a more specific statute covering the same subject.

As the Supreme Court has explained, courts should not interpret earlier, broad statutes in a manner that frustrates the purpose of a more specific, later statute's detailed remedial scheme.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989).   In enacting IRCA, Congress provided protection against citizenship discrimination, defining specifically which classes of aliens would be afforded protection on this basis and adopting a detailed administrative scheme to adjudicate citizenship discrimination claims.  *See* 8 U.S.C. § 1324b.  At the time it enacted IRCA, Congress did not believe § 1981 protected aliens from alienage discrimination.  To remedy this lacuna, it created a protection covering <u>some</u> classes of lawfully admitted aliens.   *Id*.  De Leon's claim falls outside the classes of aliens protected against citizenship discrimination under IRCA and avoids the administrative scheme created by Congress.  For this independent reason, it should be dismissed.

Courts are "reluctant . . . to read an earlier statute broadly where the result is to circumvent the detailed remedial scheme constructed in a later statute." *Patterson*, 491 U.S. at 181.  In *Patterson*, the Supreme Court explained that § 1981 (pre-1991 amendments) did not contemplate a cause of action for harassment based on race.  As it explained, § 1981's text only prohibited racial discrimination in the "making and

16

enforcement of contracts," which does not include actions after the formation of an employment relationship. *Id.* at 176-77. In contrast, Title VII provides a detailed administrative complaint procedure to resolve complaints of discrimination involving harassment. *Id.* at 165. Given the unambiguous embrace of harassment claims under Title VII, the Supreme Court held it would be improper to interpret § 1981 broadly to encompass the same claims. As Justice Kennedy put it, "[t]hat egregious racial harassment of employees is forbidden by a clearly applicable law (Title VII), moreover, should lessen the temptation for this Court to twist the interpretation of another statute (§ 1981) to cover the same conduct." *Id.* at 181.

De Leon seeks to interpret § 1981 to prohibit discrimination against all work-authorized aliens, including noncitizens who have never been admitted lawfully to the country and were given a temporary reprieve from deportation. In enacting IRCA, however, Congress considered which aliens would be protected from citizenship discrimination, and decided to protect specific classes of aliens who had been lawfully admitted and given a permanent presence in the country: permanent residents, refugees, asylees, and those provided amnesty under the statute. 8 U.S.C. § 1324b(a)(3). It specifically declined to include other classes of aliens who had short-term work authorization or had not been permanently admitted to the country. Congress also adopted a detailed procedural scheme to resolve claims of citizenship discrimination. 8 U.S.C. §1324b(b)-(j). And unlike after *Patterson*, when it overrode the Supreme Court's interpretation by amending § 1981 to cover claims after the

formation of a contract, Congress has never amended IRCA's protection to include aliens with temporary status, including DACA recipients.

Courts try to avoid repugnancy between statutes. *Howard v. Pritzker*, 775 F.3d 430, 437 (D.D.C. 2015). But, this applies where the statutes can be read compatibly, especially where the intent of Congress was to give effect to both. As the D.C. Circuit Court explained, "the Supreme Court has decline[d] to read statutes as being in irreconcilable conflict without seeking to ascertain the actual intent of Congress." *Id.* (internal citations omitted). That is why Title VII's and § 1981's protections against race discrimination are both given effect: When it enacted Title VII, Congress was aware of § 1981's existing protections and still explicitly "made clear that the remedies available to the individual under Title VII are co-extensive with the individual's right to sue under the provisions of the Civil Rights Act of 1866." *Brown v. Gen Servs. Admin.*, 425 U.S. 820, 833-34 (1976). That is not the case with IRCA.

To the contrary, at the time it enacted IRCA, Congress did not believe that § 1981 protected aliens from discrimination on the basis of citizenship. In discussing the plight of resident aliens facing discrimination, Senator Gary Hart remarked that the legislation was needed to "provide what existing laws and safeguards do not: protection against discrimination on the basis of alienage. Title VII does not cover alienage discrimination. Section 1981 of the Civil Rights Act of 1866 is not a trustworthy guardian of alien rights." 131 Cong. Rec. 23730, 1985 WL 724430, at *57 (Sept. 13, 1985). He expressed the importance of legislation to "remedy this deficiency in current law." Similarly, House Representative Jim Jeffords remarked, "[n]o

18

Federal law now prohibits employment discrimination on the basis of citizenship status." 132 Cong. Rec. 30001, 1986 WL 787407, at *3:35PM (Oct. 9, 1986) (Statement of Rep. Jeffords). Unlike Title VII, then, Congress has never expressed an intent to give effect to IRCA and § 1981.[5]

Consistent with courts' reluctance to give effect to an earlier broader statute, this Court should not give § 1981 the broad reach sought by De Leon. Applying this principle, the D.C. Court of Appeals in *Howard* held that federal employees' suit against their employer under Title VII was not subject to the six-year statute of limitations outlined in 28 U.S.C. §2401(a), which applied generally to "every civil action commenced against the United States." 775 F.3d at 436. Rather, the court concluded that Title VII's statute of limitations, which allowed claimants to file civil actions either 180 days after filing an administrative complaint or within 90 days of the administrative agency's decision, applied. *Id.* Thus, applying the more general six-year statute of limitations to claims that were still pending administrative resolution would conflict with Title VII's purpose. *Id.* at 440, 443. This is because "in enacting Title VII, Congress chose not to truncate the administrative process but rather to encourage claimants to pursue administrative proceedings to their end." *Id.*

_____

[5] Congress commissioned the Congressional Research Service to ascertain whether § 1981 provided protection from alienage discrimination and it ultimately concluded that such protection was "unsettled at best," particularly in the private employer setting when such discrimination was not based on *racial* grounds. *See* CONG. RESEARCH SERV., THE LIBRARY OF CONGRESS: COMMENTS ON LEGAL ISSUES RAISED BY DRAFT OF STAFF REPORT ON "ALIENAGE DISCRIMINATION IN EMPLOYMENT AND AGE DISCRIMINATION AGENCIES." (July 15, 1985), *available at* 131 Cong. Rec. 23730, 1985 WL 724430, at *59 (Sept. 13, 1985) (noting, "§ 1981 might provide protection only to persons who can claim that the nature of [alienage] discrimination was based on racial or color characteristics.").

at 443. In other words, the more specific statute applied because application of the more general statute of limitations would conflict with Congress' clearly stated intent to encourage resolution of employment discrimination claims through the administrative process, no matter how long that process continued.

IRCA and § 1981 share a similar conflict. Allowing citizenship discrimination claims to proceed under § 1981 runs counter to Congress' decision to define the classes of aliens subject to citizenship discrimination under IRCA and to resolve such claims through a specific, detailed administrative procedure. For this independent reason, De Leon's claim should be dismissed.

### III. The Court should not extend § 1981's implied cause of action to aliens, such as De Leon, not lawfully admitted to the U.S.

Section 1981 contains no express cause of action. It was not until 1975 that the Supreme Court first recognized an implied cause of action under § 1981. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) (recognizing a "federal remedy against discrimination in private employment on the basis of race."); *Comcast v. Nat. Assoc. of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020) ("Nothing in [Section 1981] specifically authorizes private lawsuits to enforce the right to contract. Instead, this Court created a judicially implied private right of action, definitively doing so for the first time in 1975."). Some courts have since recognized a private right of action for lawfully-admitted aliens to sue for alienage discrimination. *See e.g., Bhandari v. First Nat'l Bank of Commerce*, 808 F.2d 1082, 1100 (Jan. 29, 1987) (lawful permanent resident can sue for alienage discrimination). De Leon now requests that this Court extend the implied right to sue under § 1981

20

to aliens who are not lawfully present or admitted to the country. Doing so, however, is not supported by the legislative history of the Civil Rights Act of 1870 (the statute that expanded § 1981 to protect noncitizens) and the courts that have addressed the scope of the statute; contradicts the Supreme Court's strong reluctance to expand implied causes of action, a reticence expressed just last year when interpreting § 1981; and would incorrectly infer that granting temporary work authorization to aliens not lawfully admitted confers legal status or provides a right to sue for alienage discrimination. Based on the reasons explained below, De Leon is not a protected person and cannot sue for alienage discrimination under § 1981.

**A. Legislative history does not support expanding the scope of § 1981**.

Allowing De Leon to sue for alienage discrimination would expand the implied right to bring a private cause of action. Such expansion is not supported by prior case law or the legislative history of § 1981, none of which imply, much less state, that an alien not lawfully admitted can sue for alienage discrimination under § 1981. The Supreme Court has not decided whether inadmissible aliens may sue for alienage discrimination under § 1981. It has, however, spoken about the protections afforded non-citizens by the statute. In doing so, it has referenced only aliens who are lawfully present. *See e.g., Takahashi v. Fish & Game Comm'n.*, 334 U.S. 410, 420–21 (1948) ("all persons lawfully in this country"; "lawful alien inhabitants"; "aliens who are lawful residents")*; Graham v. Richardson*, 403 U.S. 365, 377–78 (1971) ("aliens lawfully within this country").

In *Takahashi*, the Supreme Court explained that the protections of § 1981 "embody a general policy that *all persons lawfully in this country* shall abide 'in any

state' on an equality of legal privileges with all citizens under non-discriminatory laws." 334 U.S. at 420 (emphasis added). Years later, the Second Circuit Court of Appeals became the first appeals court to hold viable alienage claims against private employers under § 1981. *See Anderson v. Conboy*, 156 F.3d 167, 169 (2d Cir. 1998) ("We hold that Section 1981 . . . proscribes private alienage discrimination with respect to the rights set forth in the statute."). Even as it allowed an expanded private right to sue, however, the *Anderson* court emphasized that § 1981 does not protect aliens who are not lawfully admitted:

> [A]ccording to appellees, applying Section 1981 to claims of private alienage discrimination would lead to the absurd result of holding liable under Section 1981 employers who refuse to hire undocumented aliens in order to comply with IRCA Section 1234a . . . . We disagree. If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage but of noncompliance with federal law.

*Id.* at 180.[6]

This understanding comports with the legislative history of § 1981, enacted in the post-Civil War reconstruction era. According to its original author, Senator William Stewart of Nevada, § 1981 was intended to "protect Chinese aliens or any other aliens *whom we allow to come here* . . . ." *Id.* at 174 (*citing* Cong. Globe, 41st Cong., 2d Sess. 3658 (1870)). During the debates over Section 1981's passage, Senator Stewart elaborated, "[w]e are *inviting* [them] to our shores, or *allowing them to come*, Asiatics. We have got a *treaty allowing them to come*." *Id.* (emphasis added). "We

---

[6] *Rodriguez* tried to distinguish *Anderson* by explaining that DACA recipients have work permits. 465 F. Supp. 3d at 1319-20. As ExxonMobil addresses below, this fact does not cure the main defect preventing such aliens from being protected under § 1981: They are not lawfully admitted.

have pledged the honor of the nation that *they may come* and shall be protected." *Id.* (emphasis added). These comments strongly suggest that Congress only intended to provide protection to persons lawfully residing in the country.

De Leon, as a DACA recipient, is not lawfully admitted to the United States. *Estrada*, 917 F.3d at 1305, 1311 (11th Cir. 2019) (explaining that DACA recipients are not "lawfully admitted," "not legally present," and remain subject to deportation). DACA only provides its recipients a temporary reprieve from deportation, pursuant to DHS's authority to exercise prosecutorial discretion. *Id.* The grant of such status does not constitute lawful admission. *Id.* (noting that the memorandum establishing the DACA program "explicitly pointed out that it 'confer[red] no substantive right, immigration status or pathway to citizenship.") Holding, then, that De Leon can sue for alienage discrimination under § 1981 would extend the statute's implied cause of action to a new class of plaintiffs, an extension that does not accurately reflect the judicial or legislative history of the statute.

### B. Courts should not read a new implied cause of action under § 1981.

Expanding the scope of aliens having standing to sue under § 1981 would also contradict the Supreme Court's strong reluctance to expand implied causes of action to allow private claims where they have not been previously accepted. *Comcast*, 104 S. Ct. at 1015. Significantly, *Johnson's* recognition of an implied cause of action occurred during the "*ancien regime*," when the Supreme Court routinely implied causes of action under federal statutes with little analysis. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (explaining, "[i]n the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now."). But

23

the Supreme Court now shows a "general reluctance to extend judicially created private rights of action." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018)). Indeed, the Supreme Court has repeatedly held that it will not recognize an implied cause of action unless Congress explicitly provides one, nor will the Court "extend" a previously recognized implied cause of action to a "new context" if circumstances warrant caution. *Ziglar*, 137 S. Ct. at 1855–58. As the Supreme Court explained in *Comcast* just last year, when it examined the scope of § 1981:

> Nothing in the [Civil Rights Act of 1866] specifically authorizes private lawsuits to enforce the right to contract. Instead, this Court created a judicially implied private right of action, definitively doing so in 1975. . . . That was during a period when the Court often 'assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose.' . . . With the passage of time, of course, we have come to appreciate that, '[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress' and '[r]aising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.'

*Comcast*, 140 S. Ct. at 1015 (internal citations omitted).

Since § 1981 itself does not provide a private cause of action, and neither the Supreme Court or any circuit court has ever expanded the private cause of action under the statute to allow inadmissible aliens to sue for alienage discrimination, allowing aliens not lawfully admitted to the country to sue for alienage discrimination under § 1981 would expand an implied cause of action. This expansion runs afoul of the Supreme Court's caution against expanding implied rights and finds no support in the legislative history or subsequent implementation of § 1981.

24

### C.  Work authorization does not confer status to sue under § 1981.

As a DACA recipient, De Leon obtained a two-year work authorization, which could be renewed.  Complaint, at ¶ 5; *Regents*, 140 S. Ct. at 1901.  A work permit, however, does not confer lawful status to the recipient.  The Immigration and Naturalization Act ("INA") distinguishes between persons lawfully admitted to the country and persons who have a legal right to work.  *See e.g.,* 8 U.S.C. §1324a(h)(3) (defining "unauthorized alien" for purposes of employment); *and* 8 U.S.C. §1182(a)(6) (defining "illegal entrants and immigration violators").  By way of example, the INA allows the issuance of work permits to individuals who have been ordered deported, but cannot be removed based upon conditions in the receiving country.  8 C.F.R. § 274a.12(c)(18) (2012).  Such an individual is "authorized" for purposes of a work permit, but is unmistakably a "deportable alien."  8 U.S.C. § 1227(a).  The fact that individuals are granted a work permit does not alter their status as inadmissible, deportable, or removable aliens.  Indeed, a work permit simply means that the employer cannot be penalized for hiring the individual. 8 C.F.R. 274a.2 (outlining requirements to verify employees are authorized to work).  Work authorizations provided to DACA recipients do not confer legal status or provide documentation that the holder is legally authorized to be in the United States.  *See Batalla Vidal v. Nielson*, 279 F. Supp. 3d 401, 423 (E.D.N.Y. 2018) (explaining, "DACA, on the other hand, offers only forbearance from deportation, along with work authorization, and does not provide an immigration status or a pathway to citizenship").[7]

---

[7] As the Supreme Court recently commented in *Regents*, DACA recipients may be considered "lawfully present" for the limited purpose of Medicare and Social Security

The district court in *Rodriguez* ignored this reasoning and held that inadmissible aliens could sue for alienage discrimination under § 1981 as long as they are work authorized. 465 F. Supp. 3d at 1320. In reaching this conclusion, the district court relied heavily on a DACA recipient's receipt of temporary work authorization, imparting on such authorization an unwarranted significance. This reading fails to capture the nuances of immigration of law and expands the impact of a work permit. In enacting the DACA initiative, the Executive used its prosecutorial discretion to defer the deportation of this group of aliens. Because they would now likely remain in the country longer, the Executive provided recipients of DACA status the ability to obtain a short-term work permit. But, that permit only allowed employers to hire these undocumented aliens without fear of penalty. It did not provide legal status or lawful admission. As the Eleventh Circuit made clear, it did not render DACA recipients legally present or lawfully admitted. *Estrada*, 917 F.3d at 1301.

The *Rodriguez* court acknowledged that "courts have had no occasion to consider whether Section 1981's protections extend to non-citizens who possess legal work authorization, but who were not 'lawfully admitted.'" 465 F. Supp. 3d at 1315. By relying so heavily on the significance of a work permit, the Florida district court nonetheless expanded alienage discrimination claims beyond their intended reach, allowing aliens who have never been lawfully admitted to the country to sue for citizenship discrimination. Given the legislative reading of § 1981 and the Supreme

_____

benefits. 140 S. Ct. at 1902 (citing regulations). But that does not mean that they have been lawfully admited into the country, nor does it change the fact that they have only been granted a temporary reprieve from deportation. *Id.* at 1912-13 (explaining that DACA affords its recipients forbearance from deportation and specific associated benefits).

Court's strong reluctance to expand implied causes of action where Congress did not provide one explicitly, such an expanded reading is not warranted. De Leon is, then, not a protected alien allowed to sue for citizenship discrimination under § 1981.[8]

### IV. ExxonMobil's policy was not the but-for cause of De Leon's offer being rescinded.

The Supreme Court confirmed last year that § 1981 claims are subject to a but-for causation standard. *Comcast*, 140 S. Ct. at 1019 (explaining that "[t]o prevail, a [§ 1981] plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). This means a plaintiff must prove that, absent the defendant's policy, he would not have suffered the injury. *Sharifi Takieh v. Banner Health*, No. 19-cv-05878-PHX-MTL, 2021 WL 268808, at *15 (D. Ariz. Jan. 29, 2021) (applying *Comcast* to explain that plaintiff failed to show that "racial prejudice…was a necessary condition of a contractual impairment."). Here, De Leon cannot establish that ExxonMobil's policy was the but-for cause of his rejection. Regardless of ExxonMobil's policy, his internship offer would have been rescinded because he was ineligible to receive a TWIC card from DHS. And, as he acknowledges, the federal government would not allow him to work at the Baton Rouge facility—the only facility for which he applied and the only place for which he received an offer—without a TWIC card.

In *Sharifi*, the court dismissed plaintiff's § 1981 race discrimination claim with prejudice because his allegations showed he could not establish but-for causation.

---

[8] This analysis, of course, would not apply going forward if Congress confers lawful status on DACA recipients and cures these deficiencies.

27

The plaintiff alleged that his termination stemmed, in part, from retaliation for testifying against his employer in a wrongful death action. *Id.* The court explained that where there exists such "independent non-discriminatory reasons for [an] alleged [contractual] impairment, a § 1981 claim is rendered implausible." *Id.* at *5. In other words, "[i[f the harm would have occurred anyway, racial discrimination is not the but-for cause of an alleged act." *Id.* at *15. *See also Astre v. McQuaid,* 804 F. App'x 665, 667 (9th Cir. 2020) (affirming dismissal of § 1981 claims "because the complaint identifies independent non-discriminatory reasons for the alleged impairment."); *Domino v. Kentucky Fried Chicken,* No. 19-CV-08449-HSG, 2020 WL 5847306 (N.D. Cal. Oct. 1, 2020) (dismissing § 1981 claim because plaintiff failed to plead that race was the but-for cause for the contractual impairment).

De Leon acknowledges that he was ineligible for the position he was offered and accepted because, given his status, he was not eligible under DHS rules for a TWIC card, which the federal government required of all employees at the Baton Rouge facility. Complaint at ¶¶ 23, 24. Therefore, even if ExxonMobil accepted all aliens regardless of immigration status or length of work authorization—in other words, if the policy De Leon assails never existed—it would have still rescinded his job offer and rejected his internship application. ExxonMobil's assailed policy was not, then, the but-for cause of De Leon's injury. Rather, the TWIC eligibility requirements were a necessary condition. On these pled facts, De Leon cannot establish that ExxonMobil's policy was the but-for cause for the rescission of his internship offer.

28

De Leon's claim is not saved by the allegation that, after rescission, he was not "offer[ed] a position at a jobsite that did not require a TWIC card." Complaint at ¶ 27. Plaintiffs raising failure-to-hire claims must show that they applied to a specific position for which the employer was seeking applicants. *Rich v. Assoc. Brands, Inc.*, 559 Fed. Appx. 67, 68 (2d Cir. Mar. 19, 2014) (rejecting plaintiff's claim for failure to satisfy the "specific job requirement"). Indeed, "[w]here a plaintiff fails to identify the *specific* job for which she applied…a plaintiff fails to establish a prima facie case." *Hunter-Rainey v. North Carolina State Univ.*, 5:17-cv-46-D, 2018 WL 1092963, at *2 (E.D.N.C. Feb. 28, 2018) (holding that plaintiff's claim failed because she did not apply for the job in question) (emphasis added); *see also Wanger v. G.A. Gray Co.,* 872 F.2d 142, 147 (6th Cir. 1989) (explaining that a failure-to-hire plaintiff must do more than express generalized interest in an open position). Here, the only specific job De Leon alleges that he applied for was the chemical engineer internship in ExxonMobil's Baton Rouge facility—a position he agrees required a TWIC card. Complaint at ¶¶ 10, 15-16, 23-24. And because his ineligibility for that card precludes him from establishing that ExxonMobil's policy was the but-for cause of his injury, De Leon's Complaint should be dismissed with prejudice.

This result comports with immigration law. IRCA, Congress' direct pronouncement on citizenship discrimination, allows such discrimination if necessary to "comply with law, regulation, or executive order, or required by Federal, State, or local government contract, or which the Attorney General determines to be essential for an employer to do business with an agency or department of the Federal, State,

or local government." 8 U.S.C. § 1324b(a)(2)(C). Here, federal rules regulated who could access the Baton Rouge facility. Complaint at ¶¶ 23-24. And De Leon's immigration status precluded him from doing so. *Id.* at ¶ 24. This fact cannot be cured through amendment, so the Complaint should be dismissed with prejudice. *See e.g., Sharifi*, 2021 WL 268808, at \*19 (dismissing complaint with prejudice where amendment would be futile).

## CONCLUSION

For the dispositive, independent reasons set forth above, the Court should dismiss the Complaint with prejudice.

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

/s/ Juan C. Enjamio
Juan C. Enjamio* (FL Bar No.: 571910)
Daniel J. Butler* (FL Bar No.: 111398)
333 SE 2nd Avenue, Suite 2400
Miami, FL 33131
Telephone: 305.810.2500
Email: jenjamio@HuntonAK.com
        dbutler@HuntonAk.com
*By Special Appearance

/s/ A. Todd Brown, Sr.
A. Todd Brown, Sr.
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
Telephone: 704.378.4727
Facsimile: 704.378.4890
Email: tbrown@HuntonAK.com
N.C. Bar No. 13806
Local Civil Rule 83.1(d) Counsel

*Attorneys for Defendant*
  *Exxon Mobil Corporation*

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2021, a true and correct copy of the foregoing was served via CM/ECF on all counsel of record.

/s/ Juan C. Enjamio
Juan C. Enjamio